UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
ANTICIA MACALOU,

                          Plaintiff,                    22-cv-10439 (PKC)

              -against-                          OPINION AND ORDER
                                                 FINDINGS OF FACT AND
                                                 CONCLUSIONS OF LAW

FIRST UNUM LIFE INSURANCE COMPANY,
MCKINSEY & COMPANY, INC. PLAN, and
MCKINSEY & COMPANY, INC.,

                          Defendants.
-----------------------------------------------------------x

CASTEL, U.S.D.J.,

            Anticia Macalou ("Macalou") was employed by McKinsey & Company

("McKinsey") as an "Expert Associate Partner."  First Unum Life Insurance Company ("First

Unum") administers a Group Long Term Disability Insurance Policy ("Long-Term Disability

Insurance Policy" or the "Policy") for McKinsey.  Macalou received short-term disability

benefits until July 20, 2021.  On July 29, 2021, Macalou submitted a claim for long-term

disability benefits, asserting that she was disabled within the meaning of the Policy due to her 1)

major depressive disorder, 2) anxiety disorder, 3) post-traumatic stress disorder ("PTSD"), and

4) attention deficit/hyperactivity disorder ("ADHD").  On January 5, 2022, First Unum informed

Macalou that she was not approved for these benefits because she was not disabled within the

meaning of the Policy.  Macalou appealed this decision, and on September 22, 2022, First Unum

notified Macalou that it was affirming its claim determination.

            Macalou brought this action against First Unum and McKinsey under the

Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 et. seq.,

seeking the benefits she alleges she is entitled to as well as attorneys' fees, prejudgment interest, and costs.  (ECF 1.)

The parties have stipulated that the action will be tried to the Court pursuant to Rule 52(a), Fed. R. Civ. P., based upon a stipulated administrative record.  (ECF 44 at 1.) Consistent with Rule 52(a), the Court will make explicit findings of fact and conclusions of law explaining its decision.  See Muller v. First Unum Life Insurance Co., 341 F.3d 119, 124 (2d Cir. 2003).

STANDARD OF REVIEW

Pursuant to ERISA section 502(a)(1)(B), 29. U.S.C. § 1132(a)(1)(B), a participant or beneficiary of a plan may bring a civil action to "recover benefits due to [her] under the terms of [her] plan, to enforce [her] rights under the terms of the plan, or to clarify [her] rights to future benefits under the terms of the plan."  The Supreme Court has held that "a denial of benefits challenged under [ERISA] is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan."  Firestone Tire and Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989).

Here, the parties have stipulated that Macalou is entitled to de novo review of First Unum's denial of her claim because First Unum failed to comply with the timeline requirements set forth in the United States Department of Labor's claims procedure regulations, 29 C.F.R. § 2560.503-1.  (ECF 40.)  Accordingly, the Court will review First Unum's denial of Macalou's claim de novo.  See Halo v. Yale Health Plan, 819 F.3d 42, 45 (2d Cir. 2016). "[U]pon de novo review, a district court may render a determination on a claim without deferring to an administrator's evaluation of the evidence."  Locher v. Unum Life Insurance Co. of America, 389 F.3d 288, 296 (2d Cir. 2004).  "The question for the Court is simply whether the

decision to deny Plaintiff's claim was correct." Kagan v. Unum Provident, 775 F. Supp. 2d 659, 670 (S.D.N.Y. 2011) (internal quotation marks, brackets, and citation omitted). Macalou maintains the burden of proving by a preponderance of the evidence that she is disabled within the meaning of the Policy. See Paese v. Hartford Life and Acc. Insurance Co., 449 F.3d 435, 441 (2d Cir. 2006).

FINDINGS OF FACT

The Long-Term Disability Insurance Policy

First Unum administers a Long-Term Disability Insurance Policy for McKinsey. (Stipulated Administrative Record ("SAR") at 98.)[1] The Policy provides that "[w]hen the Company receives proof that an insured is disabled due to sickness or injury and requires the regular attendance of a physician, the Company will pay the insured a monthly benefit after the end of the elimination period." (Id. at 112.)

Under the Policy, "'[d]isability' and 'disabled' mean that because of injury or sickness:

1.  the insured cannot perform each of the material duties of [her] regular occupation; or

2.  the insured, while unable to perform all of the material duties of [her] regular occupation on a full-time basis, is:

    a.  performing at least one of the material duties of [her] regular occupation or another occupation on a part-time or full-time basis; and

---

[1] The stipulated administrative record was filed on ECF at docket entry 80 in 14 parts. The Court's citations to the administrative record are to the bates stamp located at the bottom right-hand corner of each page. A citation to the record in this opinion is not an indication that that it is the only source that supports the stated fact.

b.  earning currently at least 20% less per month than [her] indexed pre-

disability earnings due to that same injury or sickness."

(Id. at 110.)

The elimination period is defined as "a period of consecutive days of

disability for which no benefit is payable," beginning "on the first day of disability."  (Id. at

107.)  The Policy specifies that this period is "[t]he latter of 180 days; or the discontinuation of

full income replacement under a salary continuation program (including full salary benefits

under a mandated disability program)."  (Id. at 101.)  An individual must be continuously

disabled through the elimination period in order to be eligible for long-term disability benefits.

(Id. at 1961.)  The Policy does not define the term "regular occupation."  (Id. at 98-124)

The Policy adds that monthly benefits "will be paid for the period of disability if

the insured gives to the Company proof of continued: 1. disability; and 2. regular attendance of a

physician."  (Id. at 112.)  This proof "must be given upon request and at the insured's expense."

(Id.)  As to the termination of disability benefits, the Policy states that "[d]isability benefits will

cease on the earliest of: 1. the date the insured is no longer disabled; 2. the date the insured dies;

3. the end of the maximum benefit period; 4. the date the insured's current earnings exceed 80%

of [her] indexed pre-disability earnings."  (Id. at 114.)

The Onset of Macalou's Symptoms and Her Initial Treatment with Dr. Adam

Macalou began working at McKinsey[2] as an Expert Associate Partner in May

2019.  (Id. at 303.)  According to her job description, Macalou was expected to provide clients

with specialized expertise in a particular function, industry, or technical area.  (Id. at 52.)  For

---

[2] McKinsey describes itself as "a global management-consulting firm" that advises "institutions in the private, public, and social sectors" and has "consultants in more than 60 countries."  https://www.mckinsey.com/about-mckinsey (last accessed Nov. 9, 2024).

Macalou, this meant leveraging cloud technologies, big data, advanced analytics, and machine learning to transform her clients' business models. (Id. at 1373.) She was also required to lead multiple client engagements at once, build counseling relationships with C-suite executives, drive client development efforts, and grow McKinsey's knowledge in her area of expertise. (Id. at 52.) In addition, it was necessary for Macalou to travel to client sites and frequently work 60+ hour weeks and on the weekends. (Id. at 51, 1374.) For the period from July 2020 to July 2021, Macalou's total gross compensation was $428,789. (Id. at 1358.)

  Macalou found the work environment at McKinsey to be high-pressure, struggled to fit within the firm's structure, and reported that co-workers and clients made racist or racially motivated remarks to her. (Id. at 181, 266.) Macalou perceived herself as being one of few women at McKinsey and did not believe that other Black women were in leadership roles similar to hers. (Id. at 266.) Because Macalou joined McKinsey later in her career, she also saw herself as having different views than McKinsey employees who started there as interns and rose through the ranks. (Id.) Macalou further described several instances of racial bias towards her from her co-workers and clients. (Id. at 181.)

  In June 2020, Macalou began experiencing anxiety, panic attacks, shortness of breath, racing thoughts, and an inability to sleep. (Id. at 267, 1375.) She also could not manage increasing pressure at work. (Id.) By the end of that summer, Macalou was receiving treatment for these symptoms from Dr. Antoine Adam, a board-certified psychiatrist. (Id. at 278, 550, 1375.) During their September 12 phone session, Macalou reported "feeling overwhelmed with apprehensions driven by fears" and that her work "ha[d] been suffering." (Id. at 552.) Macalou told Dr. Adam that she was requesting time off from work. (Id.) Macalou received short-term disability leave from September 14, 2020, through November 22, 2020. (Id. at 84.)

Macalou continued her treatment with Dr. Adam during this period.  She reported continuing to feel "stressed and overwhelmed." (Id. at 554.)  Dr. Adam prescribed Adderall, Clonidine, and Prozac.  (Id. at 555.)  After returning to McKinsey, Macalou reported "feeling burdened mentally" and attributed this to "jumping back in her work abruptly."  (Id. at 560.)

Macalou's Treatment with Dr. Adam and Dr. Rodriguez

On January 15, Macalou began treatment with Lilliam Rodriguez, PhD, a licensed clinical psychologist, through the "Doctor on Demand" telehealth service.  (Id. at 282, 535.)  Dr. Rodriguez's initial assessment noted that Macalou was "experiencing difficulties with sleep, feelings of constant worry, hard time concentrating, impaired relationships, fatigue and challenges with managing her time and overall life." (Id. at 542.)  Dr. Rodriguez recommended weekly psychotherapy sessions to help Macalou manage her symptoms.  (Id. at 543.)

Macalou had a full day of meetings scheduled at work for January 20.  (Id. at 267, 1376.)  But that morning, Macalou felt "paralyzed" and could not call in or start her work.  (Id.)  Instead, she turned off all of her phones and her email and slept through the day.  (Id. at 182, 1376.)  Since she missed all of her meetings and McKinsey did not hear from her for 24 hours, the firm called the police to conduct a wellness check.  (Id. at 267, 1376.)

That same day, Macalou went on short-term leave again.  (Id. at 85, 1376.)  On February 1, Dr. Rodriguez wrote in her visit notes that Macalou "presented with increased anxiety," was "pacing and speaking rapidly," and "reported having another 'breakdown' where she could not return to work, due to the exacerbation of anxiety symptoms."  (Id. at 530.)  The results of a mental status exam[3] from this visit similarly showed that Macalou's speech was

---

[3] "Mental status testing is done to check a person's thinking ability and to determine if any problems are getting better or worse."  A provider may assess a patient's appearance, attitude, orientation, psychomotor activity, attention span, recent and past memory, language function, and judgment and intelligence. https://medlineplus.gov/ency/article/003326.htm (last accessed Nov. 7, 2024).

"rapid, pressured," mood was "elevated," thought process was "circumstantial," and insight/judgment was "impaired." (Id. at 532.)

Both Dr. Rodriguez and Dr. Adam submitted substantively identical letters dated February 5 supporting Macalou's short-term leave, with March 23 initially anticipated as her return-to-work date. (Id. at 278, 282.) They wrote that Macalou had been diagnosed with generalized anxiety disorder, major depressive disorder, and ADHD. (Id.) They also identified a number of "major life activities" that Macalou's health conditions limited, including "[h]andling time pressures and multiple tasks," "[i]nteracting with others," "[s]ustaining concentration/focus," "[d]ecision-making and problem-solving," "[c]ommunication," "[o]rganization and time management," "[s]leeping," "[m]aintaining stamina/sustaining energy," "[m]emory," "[i]mpulse control," and "[c]oping with changes/interruptions." (Id.) As a result, Dr. Rodriguez and Dr. Adam concluded that Macalou was "currently unable to work" and that she "need[ed] a leave of absence for treatment and recovery." (Id.)

Macalou showed some signs of improvement in the first few months of her second period of short-term leave. On March 1, Dr. Rodriguez noted that Macalou had "reduced symptoms" and was "feeling somewhat better." (Id. at 495, 497.) One week later, Dr. Rodriguez wrote that Macalou "continue[d] to present with improved mood and affect," "report[ed] some improvement with managing her anxiety," and was "able to follow up with some colleagues and complet[e] some tasks that she had been unable to get done." (Id. at 474.) On April 12, following a trip to Mali to spend time with her husband, Macalou told Dr. Rodriguez that she "ha[d] experienced physical and emotional improvement." (Id. at 441, 564.) Throughout this period of treatment with Dr. Rodriguez, Macalou's mental status exams also consistently indicated that her rapport was "cooperative," affect was "full," thought process was

"linear," insight/judgment was "fair," and cognition was "alert and oriented x4."  (Id. at 443, 455-456, 465-466, 476, 485-486, 496-497, 511-512, 523.)

   Nonetheless, Macalou continued to experience detrimental symptoms due to her conditions.  On February 5, Dr. Rodriguez noted that Macalou "continue[d] to endorse feelings of worry, difficulty concentrating, challenges with motivation and lack of energy."  (Id. at 522.) Similarly, on February 22, Dr. Rodriguez wrote that Macalou "continue[d] to experience significant bouts of anxiety, difficulty concentrating and challenges with managing her mood and anxiety."  (Id. at 510.)  At different points in March, Dr. Rodriguez stated that Macalou was still facing "challenges around her job and career" and that her "[a]ffect and mood were depressed." (Id. at 454, 474.)  On April 12, Dr. Rodriguez also reported that Macalou "continue[d] to endorse struggles with focusing on tasks" and that she was "disappoint[ed] about her inability to function at work."  (Id. at 441.)  Macalou's mental status exams during this time frequently showed that her speech was "rapid" and that her mood was "anxious" or "depressed."  (Id. at 443, 455-56, 485-486, 511-512, 523.)

   In a letter dated April 6, Dr. Rodriguez endorsed an extension of Macalou's short-term leave.  (Id. at 87.)  Dr. Rodriguez laid out the same diagnoses and "major life activities" limitations as she had in her February 5 letter.  (Id.)  In addition, Dr. Rodriguez noted that Macalou had been advised to avoid a number of tasks due to psychological limitation, including those involving "complex activities, multi-tasking, and high expectations of productivity," as well as "time pressures and deadlines;" those requiring "sustained and significant concentration and focus" and "schedule inflexibility;" and those "which interfere with obtaining sufficient sleep."  (Id.)  Dr. Rodriguez also shared that Macalou had recently tested positive for a mutation of the MTHFR gene called the MTHFR c677T variant, which Dr. Rodriguez stated had been

shown to be linked to certain psychiatric disorders.  (Id.)  Dr. Rodriguez opined that Macalou was "currently unable to return to work" and noted that treatment for patients like Macalou would "generally take in excess of 6-9 months."  (Id.)

Macalou received an extension of her short-term disability leave from March 23 through July 5.  (Id. at 86.)  These benefits ultimately ended on July 20.  (Id. at 70.)

Macalou's Treatment with Dr. Cohen and Dr. Rodriguez

While on short-term leave, Macalou began treatment through telehealth with a new psychiatrist, Dr. Shelly Cohen.  (Id. at 69.)  At their first treatment session on April 26, Macalou reported feeling "broken" and that she would never regain the confidence she once had related to work.  (Id. at 182.)  Macalou also worried that she would be unemployable given her panic attacks "whenever she considers any work related thoughts or actions."  (Id.)  At their next session a few weeks later, Macalou told Dr. Cohen that when trying to find work she found it difficult to concentrate, that she felt "worthless," and that she went into a "negative spiral" when she looked at emails.  (Id. at 180)

Meanwhile, Macalou continued to attend treatment sessions with Dr. Rodriguez through May 24.  (Id. at 394-439.)  Dr. Rodriguez's visit notes from these sessions indicate that Macalou harbored significant concerns about her relationship with her son.  (Id. at 417, 426.)  On April 22, Macalou "identified feelings of shame and guilt" with respect to him.  (Id. at 426.).  During her next session with Dr. Rodriguez on May 18, Macalou similarly reported "feeling overwhelmed and at a loss as to how best [to] support her son."  (Id. at 417.)

Dr. Cohen and Macalou had two sessions in June, during each of which Macalou expressed continued distress about returning to work.  (Id. at 178-179.)  On June 9, Dr. Cohen wrote in her notes that Macalou still felt "paralyzed" by thoughts of returning to McKinsey or

seeking other work.  (Id. at 179.)  Dr. Cohen added that Macalou felt "hopeless."  (Id.)  On June

30, Macalou reported that while being away from work had been helpful, she still felt "unable to

return as panic [attacks] start when thinking about re-entry into a workplace that feels 'racist and

toxic.'"  (Id.)

Macalou's Long-Term Disability Claim

On July 29, 2021, Macalou submitted her claim for long-term disability benefits.

(Id. at 66.)  On the claim form, she stated that her last day worked was January 19, 2021.  (Id. at

69.)  Macalou described her medical condition as PTSD, anxiety, depressive disorder, and

ADHD.  (Id. at 68.)  She noted that her symptoms were panic attacks, lack of focus, irritability,

and sleep disturbances.  (Id.)  Macalou also wrote that she could not perform the following duties

of her occupation: "[h]andling time pressures and multiple tasks, sustaining concentration,

decision-making/problem solving, memory, communication, stamina, etc."  (Id. at 69.)  She

identified Dr. Cohen and Dr. Rodriguez as her current medical treatment providers.  (Id.)

Dr. Cohen completed an Attending Physician Statement dated July 9 for

Macalou's long-term disability application.  (Id. at 77-79.)  Dr. Cohen answered "Yes" to the

question, "Did you advise your patient to stop working?"  (Id. at 77.)  In connection with this

response, she explained that she "[a]dvised continuation of disability – [patient] began treatment

with me while on disability leave."  (Id.)  Dr. Cohen also identified PTSD as the primary

diagnosis affecting Macalou's functional capacity.  (Id.)  Dr. Cohen listed panic disorder, major

depressive disorder, and ADHD as the other diagnoses affecting Macalou.  (Id.)

The Attending Physician Statement then asked Dr. Cohen to list Macalou's

current behavioral health restrictions (activities Macalou should not do) and behavioral health

limitations (activities Macalou cannot do).  (Id. at 78.)  Dr. Cohen wrote that Macalou had

"difficulties in the following realms: concentration/focus, time management, analytic thinking, communication, task shifting." (Id.) She stated that the duration of these restrictions and limitations was from April 26, 2021, to "current," or July 9. (Id.) As to the April 26 date, Dr. Cohen explained that Macalou "experienced these difficulties prior to our treatment, but this is when I first treated her." (Id.) According to Dr. Cohen, the "diagnostic or clinical findings" that supported Macalou's restrictions and limitations were "sleep disturbance, emotional dysregulation, impulsivity, hypervigilance, panic attacks, anticipatory anxiety re: work, lack of motivation, depressed mood, agitations." (Id.) She added that Macalou had been prescribed Prozac, Adderall, Klonopin, and Xanax for treatment. (Id.)

Under the Long-Term Disability Insurance Policy, if Macalou were determined to qualify for long-term disability benefits, she would be entitled to 66 2/3% of her basic monthly earnings prior to her disability; First Unum estimates this would be $24,083.35 per month. (Id. at 100, 1982.)

Macalou's Final Treatment Session with Dr. Cohen

Macalou terminated treatment with Dr. Cohen shortly after Dr. Cohen completed the Attending Physician Statement. (Id. at 178.) During their July 21 session, Dr. Cohen discussed the details of the long-term disability paperwork with Macalou. (Id.) Although Macalou felt that she needed an "indefinite" date of return, Dr. Cohen recommended three months of leave. (Id.) According to Dr. Cohen's notes, Macalou was "[v]ery angry and upset" at that recommendation. (Id.) Dr. Cohen wrote that "[a]fter long discussion," Macalou told her that she "would like to terminate treatment at this time." (Id.)

Macalou's Initial Treatment with Dr. McAleer

Just prior to terminating treatment with Dr. Cohen, Macalou began treatment with Kelly McAleer, Psy.D., a psychologist, through "Doctor on Demand." (Id. at 262.) During their initial July 14 session, Dr. McAleer wrote that Macalou's symptoms, including anxiety, difficulty concentrating, numbness/apathy, and avoiding stimuli related to work and other high-stress situations, "were triggered by and exacerbated by work stress and exacerbated by life events." (Id. at 269.) At this time, Dr. McAleer diagnosed Macalou with major depressive disorder, other reactions to severe stress, and attention and concentration deficit. (Id.)

During a later session with Dr. McAleer on July 26, Macalou was "focused on [her] experience with [Dr. Cohen] regarding disability paperwork." (Id. at 251.) Having terminated treatment with Dr. Cohen, Macalou told Dr. McAleer that she was looking for a new psychiatrist. (Id.) Macalou added that Dr. Cohen had told her with respect to the long-term disability paperwork that "she felt extended time out discouraged return to work." (Id.)

On August 16, Dr. McAleer informed Macalou that she had received a request for medical records and a medical information intake form for Macalou's long-term disability claim. (Id. at 232.) Dr. McAleer stated that she would provide the medical records, but that she did not complete disability paperwork through "Doctor on Demand." (Id.) She explained that "this does not speak to my opinion about your need for medical leave, rather, this is my general practice on this platform." (Id.)

Macalou's Treatment with Dr. Caraballo

On August 31, about a month after terminating treatment by Dr. Cohen, Macalou began to have monthly sessions with Dr. Angel Caraballo, a psychiatrist. (Id. at 784.) During a September 9 session, Macalou reported continued struggles. (Id. at 795.) According to Macalou, she was having difficulty sleeping, her anxiety was not under control, and she was

"most concerned about her declining cognitive function and poor concentration."  (Id.)  Macalou also told Dr. Caraballo that she "forgets a lot of things and has trouble recalling information." (Id.)  For his part, Dr. Caraballo observed during these initial sessions that Macalou's language and speech were normal, her thought process was logical and goal directed, and she was alert and oriented.  (Id.)  However, he also noted that Macalou's mood was depressed or anxious, affect was constricted, concentration was poor, and recent, remote memory and fund of knowledge were mildly compromised.  (Id. at 787, 795.)

Dr. Caraballo's assessment of Macalou on September 9 described her as having "[major depressive disorder], ADHD with mild improvement in depressive symptoms but continued cognitive difficulties, intermittent anxiety, poor sleep."  (Id. at 795.)  He added that Macalou was "not functioning well and unable to meet the demands of her job."  (Id.)  Dr. Caraballo concluded that Macalou "should continue to be on her medical leave until she has return[ed] to a closer baseline."  (Id.)  He also recommended that Macalou obtain neuropsychological testing to help her better understand her cognitive issues.  (Id.)  Dr. Caraballo referred her to neuropsychologist Preetika Mukherjee, PhD.  (Id. at 569, 795.)

Macalou's Neuropsychological Evaluation

On September 21, September 24, and October 1, Macalou underwent a neuropsychological evaluation conducted by Dr. Mukherjee.  (Id. at 569.)  Dr. Mukherjee interviewed Macalou, spoke with Dr. McAleer, had Macalou complete several self-assessments, and administered a variety of neuropsychological tests.  (Id.)  Dr. Mukherjee observed that "[t]here was no evidence of minimization of effort or symptom magnification" by Macalou and that there was no reason to believe that the evaluation did not provide an accurate assessment of Macalou's neurocognitive functioning.  (Id. at 572.)

Dr. Mukherjee's neurocognitive findings showed that Macalou had a number of strengths in different areas of cognitive functioning. (Id. at 573-574.) For instance, Dr. Mukherjee found that Macalou had superior verbal comprehension skills, high average verbal working memory skills, strong expressive language skills, and strong language processing and comprehension skills. (Id.) At the same time, Macalou struggled in several other areas of cognitive functioning. Dr. Mukherjee summarized these shortcomings as follows:

> On the current assessment, even with medication, Ms. Macalou's performance was weak on the task of sustained attention. With regard to executive functioning, Ms. Macalou was slow on multiple tasks and struggled with problem-solving. The results further suggested that Ms. Macalou struggled with processing information at the level of her cognitive ability, particularly when it required a higher level of organization. With regards to the processing of information, Ms. Macalou missed many details and struggled with organizing and integrating her thoughts leading to weaker retrieval of information. Ms. Macalou's performance was inconsistent due to significant fluctuations in her attention.

(Id. 576.)

Dr. Mukherjee concluded that Macalou's neurocognitive profile "indicated that she is a very bright woman with many strengths in different areas of cognitive functioning," yet "her struggles with attention, executive functioning, and regulating emotions interfere significantly with Ms. Macalou's day-to-day functioning leading to further difficulties with emotional functioning." (Id.) Dr. Mukherjee diagnosed Macalou with PTSD, major depressive disorder, and ADHD. (Id.) Among her recommendations, Dr. Mukherjee stated that because "Ms. Macalou is struggling with a very complex psychological profile, particularly one where the traumatic experiences at work are triggering her anxiety, in my professional opinion she cannot engage in a vocation at this time." (Id. at 577.)

Macalou's Treatment Throughout the Rest of 2021

Throughout the remainder of 2021, Macalou continued to receive treatment from Dr. Caraballo and Dr. McAleer.  On October 4, Dr. Caraballo noted that Macalou "showed up this morning reporting that she had a panic attack out of nowhere."  (Id. at 782.)  Macalou attributed this occurrence primarily to her concerns about an upcoming trip to Mali to see her husband and her "worrie[s] that this will not be a good experience for her."  (Id.)  Dr. Caraballo observed that Macalou's concentration was poor, her recent, remote memory and fund of knowledge were mildly compromised, and her mood and affect were slightly restricted.  (Id. at 783.)  At their next session in November, both Macalou and Dr. Caraballo acknowledged improvements in Macalou's concentration, but continued difficulties with her memory.  (Id. at 793.)  On December 17, Macalou told Dr. Caraballo that she was feeling very overwhelmed and anxious.  (Id. at 1337.)  Macalou added that despite wanting to return to work, she was continuing to struggle with her memory, communication, and time management.  (Id.)  By the end of the year, Dr. Caraballo was still recommending that Macalou remain on leave from work. (Id.)

Dr. McAleer's treatment notes from this same period indicate that Macalou's deteriorating relationship with her husband had become a primary source of stress in her life. Upon returning from Mali in mid-October, Macalou told Dr. McAleer that the trip "was hard because it brought our marital issues front and center again."  (Id. at 1263.)  On November 22, Macalou reported that she had been "preoccupied with [her] husband's presence . . . [i]n a way that takes all the attention off my needs and caring for myself."  (Id. at 1233.)  A month later, Macalou informed Dr. McAleer that her husband had moved out and that she was "having a lot of feelings about his exit but mostly anger."  (Id. at 1212.)  As the year ended, Dr. McAleer consistently labeled Macalou's cognitive functioning as alert and oriented, her affect as

appropriate, and her interpersonal status as interactive.  (Id. at 1135, 1137, 1139, 1141.)   At the same time, though, Dr. McAleer observed that Macalou's mood ranged from mildly anxious to dysphoric and that her functional status was "[v]ariably impaired."  (Id.)

First Unum's Review of Macalou's Long-Term Disability Claim

After First Unum received Macalou's claim form, consultant Deborah Maxcy conducted a vocational review of Macalou's occupation on August 31, 2021.  (Id. at 330.) Maxcy determined that Macalou's occupation in the national economy was "Business Consultant eDOT 189.117-062."  (Id.)  Referencing Macalou's job description, she explained that the duties of the Business Consultant occupation "match the job duties of consulting in specific areas of expertise to help clients solve business issues, lead external and internal projects, client negotiation, practice development, and advise clients and management."  (Id.)  She then identified the material and substantial duties associated with that occupation, including "[i]dentifies, prospects, and closes prospective clients;" "[c]ollaborates with Account and Program Managers to drive business growth both in existing and new market segments and accounts;" "[s]ells consultatively and makes recommendations to prospects and clients of the various solutions the company can provide to address their business needs;" "[p]rovides direction and guidance for process improvements and establishing policies;" and "attend[s], exhibit[s], and present[s] at conferences and trade associations."  (Id. at 330-331.)  She described the cognitive demands of Macalou's occupation as "[h]ighly skilled work that involves dealing with people, influencing others, making judgments and decisions, [and] directing and planning the activities of others." [4]  (Id. at 331.)

---

[4] Maxcy's sources for her report included PAQ Services, Inc.'s Enhanced Dictionary of Occupational Titles (eDOT) (eDOT), data as of July 1, 2021; O*Net Online, http://www.onetonline.org and https://www.onetonline.org/link/summary/15-2031.00#DetailedWorkActivities; Occupational Outlook Handbook,

On September 3, Deborah Haight, a registered nurse and clinical consultant, performed a "clinical analysis" of Macalou's medical records.   (Id. at 336, 341.)  At this time, Haight did not have available to her any office visit notes from Dr. Adam or Dr. Rodriguez, any records from Dr. Caraballo, or Dr. Mukherjee's neuropsychological report.  (Id. at 339-340.) She did have access to Dr. Adam's and Dr. Rodriguez's letters describing Macalou's diagnoses and limitations and recommending short-term leave; Dr. Cohen's office visit notes and Attending Physician Statement; Dr. McAleer's office visit notes from July 12 to August 23; and the details of an August 4 phone conversation between Macalou and a First Unum representative where Macalou described her continued struggles and treatment history.  (Id. at 125-132, 339-340.)

Haight concluded that a lack of full-time functional capacity was not clearly seen through the elimination period, which ran from January 20, 2021, or Macalou's "first day of disability," through July 20, 2021, past the 180-day requirement.  (Id. at 107, 340-341.)  In support of her determination, Haight noted that Macalou did not have any providers currently certifying restrictions and limitations and that Macalou had terminated treatment with Dr. Cohen, who had been certifying restrictions and limitations.  (Id. at 340.)  Haight also stated, based on Dr. Cohen's and Dr. McAleer's treatment notes and mental status exams, that Macalou appeared to have improved by June 30.  (Id.)

Next, Dr. Nicholas Kletti, a psychiatrist and one of First Unum's reviewing physicians, conducted a review of Macalou's medical records.  (Id. at 351-354.)  He also attempted to contact Dr. Cohen with questions regarding Macalou's condition and the recommendation of continued disability leave noted in Dr. Cohen's July 9 Attending Physician

Management Analysts, https://www.bls.gov/ooh/business-and-financial/management-analysts htm; and The Revised Handbook for Analyzing Jobs, published by the United States Department of Labor Employment and Training Administration 1991.  (SAR at 331.)

Statement.  (Id.)  In correspondence to Dr. Cohen dated September 14, 2021, Dr. Kletti listed

several observations based on his review, including that Macalou's "going out of work was in the

context of workplace-specific stressors / dissatisfaction, e.g. her report that her work

environment was 'racist and toxic';" that Dr. McAleer's notes reflected a primary focus on

marital issues; and that Macalou's records documented her "recent travel to Africa and normal

mental status exams when not talking about prior employment."  (Id. at 351-352.)  Dr. Kletti

concluded, "It would not appear to me that Ms. Macalou is suffering from impairing mental

illness precluding ability to work full-time as a Business Consultant, i.e. for a different

employer."  (Id. at 352.)  Dr. Cohen did not respond to Dr. Kletti.  (Id. at 842.)

At Dr. Kletti's recommendation, First Unum then had neuropsychologist Edan

Critchfield, Psy.D., perform a neuropsychology consultation with respect to Dr. Mukherjee's

neuropsychological report and raw test data.  (Id. at 582, 735-736.)  In a report dated November

8, 2021, Dr. Critchfield determined that Macalou's "neuropsychological profile was valid and

does not reflect deficits that would be expected to result in functional impairment."  (Id. at 735.)

He added that despite Macalou's reported cognitive struggles, her scores were generally within

expectations.  (Id.)  Dr. Critchfield also concluded, after summarizing Macalou's reported

symptoms, her diagnoses, and the results of her mental status exams, that while her "records

provide support for the presence of anxiety and depression," they "do not reflect symptoms of a

severity or consistency that would result in functional impairment that would prevent work

activities."  (Id. at 735-736.)  He then opined that Macalou's psychological symptoms "are also

not of the severity that would result in cognitive impairment."  (Id. at 736.)

On January 4, 2022, Dr. Kletti completed a "doctoral review" based on Macalou's

updated records.  (Id. at 842-846.)  Dr. Kletti concluded that "[t]o a reasonable degree of medical

certainty" he "d[id] not find file information to support continuous psychiatric or cognitive impairment from last day worked through the July 20, 2021 elimination period end date." (Id. at 846.) In his analysis, Dr. Kletti ascribed Macalou's decision to take short-term leave in January 2021 to "workplace-specific stressors," namely the racial bias that Macalou reported experiencing at McKinsey. (Id. at 844.) He also noted that Macalou was facing "workplace-specific issues" in May 2021, as evidenced by her stated desire to not return to the firm. (Id.) Dr. Kletti added that Dr. McAleer's treatment notes showed significant improvement on the part of Macalou. (Id. at 845.) Moreover, Dr. Kletti stated that Dr. Critchfield's consultation contradicted Dr. Mukherjee's and Dr. Caraballo's assessments, and that Dr. Caraballo was not certifying impairment prior to his initial session with Macalou on August 31. (Id. at 845-846.)

Because of his disagreement with Dr. Cohen's certification, Dr. Kletti recommended that an additional review be conducted by First Unum's designated medical officer, Dr. Stuart Shipko, also a psychiatrist. (Id. at 846, 848.) On January 4, Dr. Shipko similarly concluded that behavioral health restrictions and limitations were not supported. (Id. at 848-852.) Dr. Shipko determined that Dr. Adam's, Dr. Rodriguez's, and Dr. McAleer's office visit notes reflected a "mild, stable illness." (Id. at 850-851.) To go along with this, he viewed Dr. Cohen's notes as "inconsistent with impairing illness" because she made minimal changes to the medications prescribed by Dr. Adam and also because Macalou's symptoms were specific to her situation at McKinsey. (Id. at 851.) He added that by late July Macalou's symptoms were "largely in remission." (Id.) Dr. Shipko also viewed Dr. Caraballo's conclusion that Macalou was unable to work as inconsistent with Dr. Mukherjee's findings, as interpreted by Dr. Critchfield. (Id. at 851-852.)

First Unum's Denial and Macalou's Unsuccessful Return to Work

On January 5, 2022, First Unum denied Macalou's claim for long-term disability benefits.  (Id. at 857-864.)  In a letter informing Macalou of its decision, First Unum explained that it had determined that she was able to perform the duties of a Business Consultant as of July 20, 2021.  (Id. at 857-858.)  In turn, First Unum found that she was not disabled under the Policy from her "date of disability through the elimination period and ongoing."  (Id.)

Following First Unum's denial of her claim, Macalou returned to work at McKinsey from March 1, 2022, through June 17, 2022.  (Id. at 1043, 1378.)  Macalou told Dr. McAleer, who she was continuing weekly or sometimes twice weekly sessions with, that this decision was made out of financial necessity.  (Id. at 1036, 1060, 1062.)  Her return to McKinsey was also on a part-time, "trial" basis, and undertaken with the firm's agreement to provide certain accommodations.  (Id. at 1043, 1378.)  Initially, Macalou felt good about her return to work.  (Id. at 1104-1105, 1107-1108.)  She reported that being back at McKinsey was "fulfilling as it helped her realize that she 'could do it.'"  (Id. at 1105.)  She also considered moving to full-time status.  (Id. at 1104.)

But, by early April, Macalou was reporting feeling anxious and overwhelmed, forgetting her words in meetings, and that "she was perhaps overly ambitious and overly optimistic about her return to work."  (Id. at 1095-1096.)  In late May, Macalou reported to Dr. Caraballo, who she was still seeing on a monthly basis, that her situation was "hopeless," her hair was falling out, and she found it "difficult to recognize that this job is not for her."  (Id. at 1322.)  At the same time, Dr. McAleer continued to observe with respect to Macalou's functional status that she was "[v]ariably impaired" and also noted in relation to her return to work that she was "struggling."  (Id. at 1060.)  On June 2, Macalou told Dr. McAleer that she had decided to leave McKinsey.  (Id. at 1058.)  She resigned from her position two weeks later.  (Id. at 1378.)

<u>Macalou's Appeal of First Unum's Denial</u>

Macalou appealed First Unum's denial of her claim on June 30, 2022.  (<u>Id.</u> at 987.)  As part of her appeal, Macalou submitted the following additional documentation: a narrative report dated March 25, 2022, updated medical records, and a supplemental letter dated June 24, 2022, from Dr. McAleer; updated medical records and a Mental Residual Functional Capacity Questionnaire dated February 14, 2022, from Dr. Caraballo; a narrative report from Dr. Mukherjee; a vocational evaluation dated May 27, 2022, conducted by Macalou's vocational expert, Ashley Johnson; and affidavits from Macalou and her husband.  (<u>Id.</u> at 990-991.)

On February 14, Dr. Caraballo completed a Mental Residual Functional Capacity Questionnaire concerning Macalou's mental health impairments and their impact on her ability to perform her employment duties.  (<u>Id.</u> at 1311-1316.)  Dr. Caraballo identified her current diagnoses as PTSD, ADHD, and major depressive disorder.  (<u>Id.</u> at 1311.)  He also stated that he believed that Macalou was totally disabled from her occupation and that her impairment had lasted, or was expected to last, at least 12 months.  (<u>Id.</u> at 1315-1316.)  Based on his assessment of Macalou, Dr. Caraballo was asked to indicate her functional capacity with respect to several work-related activities.  (<u>Id.</u> at 1313.)  Dr. Caraballo provided that Macalou was "[u]nable to meet competitive standards" with respect to a number of activities, meaning she could not "satisfactorily perform [them] independently, appropriately, effectively and on a sustained basis in a regular work setting."  (<u>Id.</u> at 1313-1315.)  These activities included:

- Understand and remember detailed instructions;

- Maintain attention and concentration for extended periods;

- Perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances;

- Work in coordination with or proximity to others without being distracted by them;

- Complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods;

- Accept instructions and respond appropriately to criticism from supervisors;

- Respond appropriately to changes in the work setting;

- Deal with normal work stress; and

- Deal with stress of semi skilled and skilled work.

(Id. at 1314-1315.)

In her March 25 narrative report, Dr. McAleer explained that Macalou had sought treatment with her for her many self-reported symptoms, including anxiety, depression, attention difficulties, challenges concentrating, apathy, and feelings of guilt and low self-worth.  (Id. at 1036.)  Dr. McAleer noted that throughout the length of her treatment Macalou faced numerous issues due to her symptoms, including difficulties with "concentrating and paying attention," "starting/completing tasks," "prioritizing tasks and managing her time," "communicating (i.e., interacting)" with others, and "[s]tress intolerance."  (Id. at 1036-1037.)  Considering the duties of an "Expert Associate Partner," Dr. McAleer stated that her symptoms "make this high level of performance impossible and have prevented her ability to meet these standards."  (Id. at 1037.)

Dr. McAleer also reviewed Macalou's records from Dr. Adam, Dr. Rodriguez, and Dr. Cohen, as well as Dr. Shipko's report prepared for First Unum.  (Id. at 1038-1039.)  Based on the records from Macalou's prior treating providers, Dr. McAleer observed that Macalou's limitations were largely unchanged since January 20, 2021.  (Id. at 1038.)  Dr.

McAleer determined that these records and her own treatment showed that, from at least that point in time, Macalou had been unable to satisfactorily perform the duties of her occupation. (Id.)  In response to Dr. Shipko's opinion that Macalou's symptoms were "primarily specific to her job situation," Dr. McAleer wrote that her symptoms "transcend her 'job situation,' and would likely be present in any high pressure work environment."  (Id. at 851, 1039.)

On June 24, Dr. McAleer also prepared a supplemental letter to her narrative report to address Macalou's recent return to McKinsey.  (Id. at 1043-1044.)  Dr. McAleer explained that she only "agreed" to Macalou's attempted return to work due to the financial stress that she was experiencing and with the condition that McKinsey would agree to provide accommodations.  (Id. at 1043.)  Dr. McAleer also stated that she was prepared to "closely monitor" Macalou's return through twice weekly treatment sessions.  (Id.)  Noting Macalou's eventual departure from McKinsey, McAleer wrote that despite these precautionary steps Macalou's "[s]ymptoms quickly became increasingly more severe, to the extent that she likely would have decompensated to a more distressed state, as stress is compounded."  (Id.)

In further support of Macalou's appeal, Dr. Mukherjee prepared a narrative report responding to Dr. Critchfield's conclusions in his consultation for First Unum.  (Id. at 1345-1346.)  Contrary to Dr. Critchfield's finding that Macalou's neuropsychological profile "does not reflect deficits that would be expected to result in functional impairment," Dr. Mukherjee emphasized that it is the interaction between Macalou's cognitive and emotional functioning that leads to impairment.  (Id. at 735, 1345.)  Turning to Dr. Critchfield's determination that Macalou's "[p]sychological symptoms are also not of the severity that would result in cognitive impairment," Dr. Mukherjee stated that Macalou's PTSD symptoms in particular "result in

functional impairment not only related to work but also in her social functioning." (Id. at 736, 1345-1346.)

Macalou also submitted a vocational evaluation conducted by her vocational expert, Ashley Johnson. (Id. at 1350-1367.) While First Unum's vocational consultant, Maxcy, had determined that Macalou's occupation in the national economy was "Business Consultant eDOT 189.117-062," Johnson classified Macalou's occupation as "Project Director (DOT Code: 189.117-030)" and "Project Management Specialist (O*Net Code: 13-1082.0)." (Id. at 330, 1358-1359.) Referencing Macalou's job description and the vocational resources that she consulted, Johnson described the cognitive requirements of Macalou's job as "extended periods of focus and concentration; critical thinking; strong problem-solving skills; quantitative and analytical abilities; the ability to collaborate, relate, and interact with clients and colleagues; attention to detail; and the ability to rapidly absorb and analyze complex information."[5] (Id. at 1359.) She also noted that the responsibilities of the Project Director and Project Management Specialist occupation included "directing activities of others, making judgments and decisions, and dealing with people;" "managing information technology projects;" "developing operating strategies;" "preparing technical reports or presentations;" "presenting work to clients for approval;" and "reporting information to managers or other personnel." (Id. at 1362-1363.)

Based on her own review of Macalou's medical records and an interview with Macalou, Johnson further opined that Macalou "has been, and continues to be unable to perform the material and substantial duties of her own occupation, or any gainful occupation since January 2021." (Id. at 1364-1367.)

First Unum's Review on Appeal

---

[5] Johnson's sources for her evaluation included The Dictionary of Occupational Titles, published by the United States Department of Labor 1991; Selected Characteristics of Occupations; and O*Net. (SAR at 1358-1364.)

Following its receipt of Macalou's additional documentation on appeal, First Unum obtained a vocational evaluation from consultant Kelly Marsiano.  (Id. at 1475-1477.)  Marsiano reviewed Macalou's job description and other supplemental information that she had submitted related to her role, Maxcy's vocational review for First Unum, and Johnson's vocational evaluation provided with Macalou's appeal.  (Id.)  Marsiano concluded that there did not "appear to be substantive vocational disagreement" between Maxcy and Johnson and that Macalou's additional information did not alter Maxcy's vocational review.[6]  (Id. at 1476.)

To go along with this, on July 25, 2022, Megan Yeaton, a registered nurse and clinical consultant, prepared a "clinical analysis" of Macalou's medical records.  (Id. at 1478-1490.)  As written in her report, Yeaton concluded that the medical and file evidence "support" restrictions and limitations "that would have precluded [Macalou] from performing the cognitive demands" of her occupation through the elimination period.  (Id. at 1488.)  However, Yeaton's analysis and rationale appeared to be inconsistent with that conclusion.  (Id. at 1488-1489.)  Yeaton noted that Macalou's decision to stop working was caused by workplace-specific stressors; that Macalou gradually improved after leaving work, as shown by her providers' treatment notes and mental status exams, her travels to Mali, and her renewed ability to socialize; and that Macalou's medications were effective.  (Id.)

Yeaton later performed an additional "clinical analysis" in which she clarified her conclusion.  (Id. at 1941-1951.)  Based on the same reasons provided in her initial report, this time Yeaton wrote that the evidence "does not support" restrictions and limitations that would have prevented Macalou from performing the cognitive demands of her job.  (Id. at 1949-1950.)

---

[6] Marsiano listed PAQ Services, Inc.'s Enhanced Dictionary of Occupational Titles (eDOT), retrieved from www.erieri.com/occupationalassessor, as the source for her evaluation.  (SAR at 1477.)

Finally, psychiatrist Dr. Peter Brown completed a medical file review of Macalou's records on August 1.  (Id. at 1491-1496.)  Noting that there was "evidence of a chronic complex psychiatric condition that will benefit from ongoing treatment," Dr. Brown concluded that restrictions and limitations "can be supported for the closed timeframe [January 20 through May 19, 2021] only," but not through the entirety of the elimination period ending July 20.  (Id. at 1495.)  He explained that restrictions and limitations were supported for that limited period based on "the need to evaluate, initiate further treatment and stabilize the claimant's condition."  (Id.)  Dr. Brown continued that Macalou's records showed improvement during the first half of 2021, apart from her "marked anticipatory anxiety" and "mounting distress" about returning to McKinsey.  (Id.)  Dr. Brown opined that as of May 19, 2021, Macalou's symptoms were "predominantly situational."  (Id. at 1496.)  He added that "[t]here is no evidence or assertion of restrictions or limitations due to general medical condition."  (Id.)

This Action

On September 22, 2022, First Unum denied Macalou's appeal.  (Id. at 1960-1969.)  Macalou filed this action against First Unum and McKinsey on December 9, 2022, bringing a claim challenging First Unum's failure to pay her long-term disability benefits under the Policy.  (ECF 1 at ¶¶ 146-168.)  In addition to payment of those benefits, Macalou sought attorneys' fees, pre-judgment interest, and costs.  (Id. at 35-36.)  The parties agreed that the action would be tried to the Court pursuant to Rule 52(a), Fed. R. Civ. P., based upon a stipulated administrative record.  (ECF 44 at 1.)

CONCLUSIONS OF LAW

Upon de novo review, the Court finds and concludes that Macalou has demonstrated by a preponderance of the evidence that from the period of January 20, 2021, the

first day of the elimination period, to September 22, 2022, when First Unum denied Macalou's appeal, she was disabled from performing each of the material duties of her regular occupation within the meaning of the terms of the Policy. The disability was caused by the following conditions from which she suffered: major depressive disorder, anxiety disorder, PTSD, and ADHD.

The stipulated record largely amounts to a dispute between Macalou's treating providers and First Unum's file reviewers. On one hand, Macalou's providers—Dr. Adam, Dr. Rodriguez, Dr. Cohen, Dr. McAleer, and Dr. Caraballo—each concluded in the course of their treatment of Macalou that her health conditions limited her functional capacity to such a degree that she was unable to perform her occupational duties. On the other hand, First Unum's file reviewers—Haight, Dr. Kletti, Dr. Shipko, Yeaton, and Dr. Brown—were almost uniformly in agreement that Macalou's symptoms were workplace-specific, that she had shown significant improvement by the end of the elimination period, and that objective measures such as Macalou's mental status exams and Dr. Mukherjee's neuropsychological testing did not support her providers' determinations. They found that Macalou was not prevented from carrying out the cognitive demands of her occupation through the entire elimination period and beyond.

The Supreme Court has held that while ERISA plan administrators "may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician," they are not required "automatically to accord special weight" to such opinions. Black & Decker Disability Plan v. Nord, 538 U.S. 822, 834 (2003). But "this does not mean that a district court, engaging in a *de novo* review, cannot evaluate and give appropriate weight to a treating physician's conclusions, if it finds these opinions reliable and probative." Paese, 449 F.3d at 442. The Second Circuit has instructed that a district court is "free to evaluate [a

physician's] opinion in the context of any factors it consider[s] relevant, such as the length and nature of the [physician-patient] relationship, the level of the doctor's expertise, and the compatibility of the opinion with the other evidence." Connors v. Connecticut General Life Insurance Co., 272 F.3d 127, 135 (2d Cir. 2001). This "freedom of evaluation extends to the opinions of non-treating physicians who have not examined a plaintiff and base their opinions solely upon the documents in an insurance company's claim file." Sheehan v. Metropolitan Life Insurance Co., 368 F. Supp. 2d 228, 253 (S.D.N.Y. 2005).

Length and Nature of the Relationship

The Court finds that the "length and nature" of Macalou's relationships with her treating providers render their opinions more credible and persuasive than those of First Unum's file reviewers. Connors, 272 F.3d at 135. It is significant that none of First Unum's file reviewers treated, examined, or spoke to Macalou prior to the initial claim denial or during her appeal. In such cases, a court may accord greater weight to the conclusions of treating physicians than to those of non-examining physicians. See id. at 135-36 (noting that if "the District Court [had] recognized that Dr. Reddy was Connors's regular physician, it would no doubt have accorded his opinion greater weight" given that defendant's physicians either only examined Connors once or never at all); Chicco v. First Unum Life Insurance Co., 20-cv-10593 (DLC), 2022 WL 621985, at *4 (S.D.N.Y. Mar. 3, 2022) (finding it significant in determining that plaintiff was disabled that "none of First Unum's physicians personally examined Chicco," while "every medical professional that did examine Chicco found that she was unable to perform her job duties"), partial reconsideration granted on other grounds, 2022 WL 973733 (S.D.N.Y. Mar. 30, 2022).

Affording greater weight to the opinions of treating physicians is especially appropriate where, as here, a plaintiff's symptoms are subjective and arise from psychiatric conditions.  See Winkler v. Metropolitan Life Insurance Co., 170 Fed.Appx. 167, 168 (2d Cir. 2006) (summary order) ("MetLife's exclusive reliance on second-hand opinions adds to the overall picture of its decision as less than fair.  First-hand observation is especially important in the context of assessing psychiatric disabilities.") (citing Sheehan, 368 F. Supp. 2d at 255); Sheehan, 368 F. Supp. 2d at 254 ("Courts routinely discount or entirely disregard the opinions of psychiatrists who had not examined the individual in question at all or for only a limited time.") (collecting cases); Diamond v. Reliance Standard Life Insurance, 672 F. Supp. 2d 530, 537 (S.D.N.Y. 2009) ("[E]specially when the chief symptoms of the illnesses are subjective . . . [,] due weight should be given to the treating physician's findings since that physician has the most experience with the patient and his or her history with the symptoms of the illness."); Westphal v. Eastman Kodak Co., 05-cv-6120, 2006 WL 1720380, at *5 (W.D.N.Y. June 21, 2006) ("There can be no serious doubt that a psychiatric opinion based on a face-to-face interview with the patient is more reliable than an opinion based on a review of a cold, medical record.").

The court in Westphal provided a persuasive explanation for taking such an approach:

> The psychiatric treating model requires that a doctor treating a psychiatric patient conduct an interview, and medical examination of the patient.  Because of the inherent subjectivity of a psychiatric diagnosis, and because a proper diagnosis requires a personal evaluation of the patient's credibility and affect, it is the preferred practice that a psychiatric diagnosis be made based upon a personal interview with the patient.

2006 WL 1720380, at *5 (citation omitted).

Unlike First Unum's file reviewers, Macalou's providers based their opinions on their personal interactions with and evaluations of her over multiple treatment sessions.  The

record shows that Macalou began to receive treatment for her symptoms prior to the start of the
elimination period on January 20, 2021, and continued to do so through that period and to the
date of her appeal on June 30, 2022: Dr. Adam treated her on ten occasions from September 1,
2020, through March 20, 2021; Dr. Rodriguez had 13 treatment sessions with Macalou between
January 15, 2021, and May 24, 2021; Dr. Cohen treated her on five occasions from April 26,
2021, through July 21, 2021; Dr. McAleer treated her on close to 70 occasions from July 14,
2021, through June 20, 2022; and Dr. Caraballo had nine sessions with Macalou from August 31,
2021, through May 26, 2022.  (SAR at 178-182, 217-273, 394-545, 550-565, 782-801, 1048-
1307, 1320-1341.)

      The nature of the relationships between the providers and Macalou are fairly
described as "typical doctor-patient relationship[s]."  Barbu v. Life Insurance Co. of North
America, 35 F. Supp. 3d 274, 289 (E.D.N.Y. 2014).  They "did not begin in the context of
litigation but instead evolved" over the course of several treatment sessions with Macalou.  Id.
Nothing in the record indicates that Macalou's providers lacked sufficient time or opportunity to
make informed assessments regarding Macalou's condition.

      Of course, file reviewers for a disability insurer will never be in a position to
claim treating-physician status.  Nor would an independent examination of a person claiming a
mental health condition be the equivalent of that of a treating physician.  Nevertheless, the
opinions of experts not in a treating relationship may, in a particular case, be more persuasive
than those of a treating provider.  But that is not the case on this record.

Level of Expertise

      Macalou's three treating psychiatrists and two treating psychologists and First
Unum's three reviewing psychiatrists each appear to have the relevant expertise to opine on

Macalou's health conditions.  But First Unum's "clinical consultants," Haight and Yeaton, do not.  Both are registered nurses, and there is no evidence in the record that either has medical expertise with respect to psychological disabilities.  Haight concluded on September 3, 2021, that based on her review of Macalou's records a lack of full-time functional capacity was not clearly seen through the elimination period.  (SAR at 340-341.)  Yeaton similarly determined on August 15, 2022, that the evidence did not support restrictions and limitations that would have prevented Macalou from performing the cognitive demands of her occupation through the elimination period.  (Id. at 1949-1950.)  Because Haight and Yeaton do not have expertise in the area of psychological conditions, the Court finds their views to be less persuasive than those of both Macalou's treating providers and First Unum's reviewing physicians.  See Fichtl v. First Unum Life Insurance Company, 22-cv-06932 (JLR), 2024 WL 1300268, at *14 (S.D.N.Y. Mar. 26, 2024) (noting that when "physicians' areas of expertise are more relevant . . . their views are more persuasive").

            In addition, the credibility of Haight's and Yeaton's assessments is diminished by two further observations from the record.  First, Haight completed her "clinical analysis" at a time when she did not have access to a substantial portion of Macalou's medical records that were submitted as part of her initial long-term disability claim, including any office visit notes from Dr. Adam or Dr. Rodriguez, several months of office visit notes from Dr. McAleer, any records from Dr. Caraballo, and Dr. Mukherjee's neuropsychological report.  (SAR at 339-340.)  Haight's review of limited information sources, particularly in light of her lack of relevant expertise, undermines the reliability of her opinion.  Second, when Yeaton first prepared a "clinical analysis" of Macalou's medical records on July 25, 2022, she wrote as her conclusion that the records in Macalou's file "support" restrictions and limitations that would have

prevented her from working.  (Id. at 1488.)  Although Yeaton's analysis in that same report

seemed to back the opposite conclusion, it appears that her second report from September 3 was

prepared primarily to clarify her conclusion.  (Id. at 1488-1489, 1941-1951.)  These

circumstances call into question the care with which Yeaton performed her analysis and the

ensuing reliability of her opinion.

Compatibility with the Other Evidence

        The probity of the opinions of Macalou's treating providers is further bolstered by

their "compatibility . . . with the other evidence" in the record.  Connors, 272 F.3d at 135.  To

begin with, Macalou's providers all corroborate one another with respect to Macalou's

diagnoses, the detrimental impact of these conditions on her functioning, and her inability to

return to work.  See Barbu, 35 F. Supp. 3d at 290 (finding the records of six treating providers

"highly probative" where "[e]ach provider observed how the same conditions affected plaintiff,

and no provider concluded that he was capable of returning to work").  From the start of the

elimination period, Macalou was repeatedly diagnosed with anxiety disorder, major depressive

disorder, and ADHD, with Dr. Cohen and Dr. Caraballo also adding PTSD to that list.  (SAR at

77, 269, 278, 282, 1311.)  Due to Macalou's health conditions and symptoms, her providers

consistently found that she was limited from performing a wide range of activities relevant to her

ability to work.  These included sustaining concentration and focus, communicating and

interacting with others, time management and multi-tasking, analytical thinking, and tolerating

stress.  (Id. at 78, 87, 278, 282, 1036-1037, 1314-1315.)  Based on these limitations, Macalou's

providers shared the view during and after the elimination period that she was unable to work:

- In their February 5, 2021, letters endorsing a second period of short-term

  disability leave from McKinsey, Dr. Adam and Dr. Rodriguez wrote that

Macalou was "currently unable to work" and anticipated that she may be able to return to McKinsey on March 23.  (Id. at 278, 282.)

- In her April 6 letter, Dr. Rodriguez supported an extension of Macalou's short-term leave and estimated that treatment for patients like Macalou would "take in excess of 6-9 months."  (Id. at 87.)

- In her Attending Physician Statement from July 9, Dr. Cohen wrote that she had advised Macalou to remain out of work.  (Id. at 77.)  She also noted that Macalou's behavioral health restrictions and limitations began before their initial April 26 treatment session and that she was continuing to experience them as of the date of her Statement.  (Id. at 78.)  During their July 21 treatment session, Dr. Cohen recommended an additional three months of leave.  (Id. at 178.)

- After Dr. Caraballo began treating Macalou on August 31, he consistently observed through to the start of 2022 that she was "not functioning well and [was] unable to meet the demands of her job given her current cognitive and emotional functioning."  (Id. at 783, 793, 795, 1337.)  Accordingly, he did not deviate from his view that Macalou "should continue to be on her medical leave until she is closer to her baseline functioning."  (Id.)  In his Mental Residual Functional Capacity Questionnaire from February 14, 2022, Dr. Caraballo stated that he believed that Macalou was totally disabled from her occupation.  (Id. at 1316.)  He also noted that her impairment had lasted, or was expected to last, at least 12 months.  (Id. at 1315.)

- Dr. McAleer, who began treating Macalou on July 14, 2021, did not opine prior to First Unum's initial claim denial on Macalou's capacity to work. It was Dr. McAleer's policy to not complete disability paperwork through the "Doctor on Demand" platform. (Id. at 232.) In her March 25, 2022, narrative report, however, Dr. McAleer concluded based on her review of Macalou's medical records and her own treatment that Macalou had been unable to satisfactorily perform the duties of her occupation from at least January 20, 2021. (Id. at 1038.)

And it was not just Macalou's providers that held these opinions. One of First Unum's own reviewing physicians, Dr. Brown, concluded that Macalou's records supported restrictions and limitations for a significant portion of the elimination period. Following his review, Dr. Brown wrote that "[t]here is evidence of a chronic complex psychiatric condition that will benefit from ongoing treatment." (Id. at 1495.) Citing the need to evaluate, treat, and stabilize Macalou's condition, Dr. Brown determined that restrictions and limitations were supported from January 20, 2021, to May 19. (Id.) It is notable that evidence corroborating Macalou's disability, particularly during the elimination period, comes not just from each of her treating providers, but also from one of First Unum's three reviewing physicians, and the only physician to conduct a review for First Unum following Macalou's appeal.

Defendants repeatedly state that Dr. Cohen was the sole provider certifying restrictions and limitations for Macalou's disability claim. (See, e.g., Def. Br., ECF 81 at 2, 12, 19.) They are correct that Dr. Cohen was the only provider to submit an Attending Physician Statement together with Macalou's claim form filed on July 29, 2021. (SAR at 77-79.) But, as detailed above, Dr. Cohen was not the only provider to conclude that Macalou's health

conditions prevented her from working during the elimination period, for the remainder of 2021, and up until the point of her appeal.

Defendants also contend that Macalou's decision to terminate treatment with Dr. Cohen on July 21, 2021, after Dr. Cohen declined to endorse an "indefinite" period of leave, calls into question Macalou's true limitations and the credibility of her claim.  (See, e.g., Def. Br., ECF 81 at 2-3; Def. Opp., ECF 86 at 10; Def. Reply, ECF 90 at 6.)  The Court does not share this view.  Although Dr. Cohen did not recommend an indefinite leave, she still supported Macalou remaining out of work until late October, or well past the end of the elimination period. (SAR at 178.)  This was in line with Dr. Rodriguez's estimate in April that treatment for patients like Macalou would "take in excess of 6-9 months."  (Id. at 87.)  It was also consistent with Dr. Caraballo's determination at the start of September that Macalou was not fit to return to work. (Id. at 795.)  Dr. Cohen's position in July does very little to challenge the later opinions of Dr. Caraballo and Dr. McAleer in particular, both of whom concluded that Macalou remained disabled beyond October based on their concurrent treatment of her.  (Id. at 793, 1038, 1316, 1337.)  There is also no evidence in the record that Dr. Caraballo's and Dr. McAleer's conclusions were influenced by anything other than their evaluations and treatment of Macalou.

The opinions of Macalou's treating providers are also supported by objective medical evidence, especially Dr. Mukherjee's neuropsychological testing conducted in late September and early October 2021.  In the case of psychological disabilities, such an evaluation is a valuable source of corroborating evidence.  See Doe v. Unum Life Insurance Co. of America, 116 F. Supp. 3d 221, 229-30 (S.D.N.Y. 2015) (finding that neuropsychological testing corroborated a treating physician's conclusions as to plaintiff's psychiatric conditions and inability to work).  Dr. Mukherjee relied on several sources of data to reach her conclusions: an

interview with Macalou, a conversation with Dr. McAleer, multiple self-assessments completed by Macalou, and a battery of neuropsychological tests.  (SAR at 569-570.)  The results of Dr. Mukherjee's neuropsychological evaluation showed that Macalou struggled in the areas of sustained attention, executive functioning, processing information, and regulating her emotions in ways that would interfere with her day-to-day functioning.  (Id. at 576.)  In line with Macalou's treatment providers, Dr. Mukherjee diagnosed her with PTSD, ADHD, and major depressive disorder.  (Id.)  She likewise concluded that Macalou could not "engage in a vocation at this time."  (Id. at 577.)

Defendants rely on Dr. Critchfield's neuropsychology consultation to rebut Dr. Mukherjee's determinations.  (See, e.g., Def. Br., ECF 81 at 21-22; Def. Opp., ECF 86 at 12-13; Def. Reply, ECF 90 at 9-11.)  Contrary to Dr. Mukherjee, Dr. Critchfield opined that Macalou's neuropsychological profile did not evidence deficits that would result in functional impairment and that her symptoms were not sufficiently severe or consistent to prevent her from working. (SAR at 735-736.)  But Dr. Critchfield's evaluation was much less comprehensive than Dr. Mukherjee's.  Dr. Mukherjee interacted with Macalou over three days, consulted one of her treating providers, and administered the neuropsychological tests herself—factors that would help guide any interpretation of Macalou's performance and functional capacity.  Dr. Critchfield, on the other hand, relied entirely on a second-hand review of Macalou's medical records, including Dr. Mukherjee's own report and the raw test data.  (Id. at 735.)  Dr. Mukherjee also thoroughly explained the bases for her conclusions, including her observation that Macalou's psychological symptoms interfered with her cognitive functioning.  (Id. at 575-576.)  Meanwhile, Dr. Critchfield's explanations were cursory at best.  After summarizing Macalou's neuropsychological test results, symptoms, diagnoses, and mental status exam results, Dr.

Critchfield gave very little insight into which of these factors he relied on to reach his conclusions.  (Id. at 735-736.)  The Court considers Dr. Mukherjee's opinions to be more persuasive than Dr. Critchfield's.  The Court also notes that both Dr. Mukherjee and Dr. Critchfield recognized the validity of the results of the neuropsychological testing.  (Id. at 572, 735.)  As Dr. Mukherjee observed, "[t]here was no evidence of minimization of effort or symptom magnification."  (Id. at 572.)

Defendants also point to the results of Macalou's mental status exams as evidence of her improvement prior to and after the end of the elimination period.  (See, e.g., Def. Br., ECF 81 at 2, 3, 23; Def. Opp., ECF 86 at 7, 12; Def. Reply, ECF 90 at 7, 8, 9.)  It is true that at various points throughout Macalou's treatment her mental status exams produced some normal results.  From February 2021 to April 2021, Dr. Rodriguez frequently found that her rapport was cooperative, affect was full, thought process was linear, insight and judgment were fair, and cognition was alert and oriented.  (SAR at 443, 455-456, 465-466, 476, 485-486, 496-497, 511-512, 523.)  In September, Dr. Caraballo similarly noted that Macalou's language and speech were normal, thought process was logical and goal directed, and she was alert and oriented.  (Id. at 795.)  And as the year concluded, Dr. McAleer observed that Macalou's cognitive functioning was alert and oriented, affect was appropriate, and interpersonal status was interactive.  (Id. at 1135, 1137, 1139, 1141.)

But these results only paint a partial picture.  During the same February to April timeframe, Dr. Rodriguez's mental status exams repeatedly showed that Macalou's speech was rapid and that her mood was anxious or depressed.  (Id. at 443, 455-456, 485-486, 511-512, 523.)  In August and September, Dr. Caraballo also observed that Macalou's concentration was poor, her mood was depressed or anxious, and her affect was constricted.  (Id. at 787, 795.)  He then

noted in November that Macalou's recent, remote memory and fund of knowledge remained compromised.  (Id. at 793.)  Dr. McAleer, for her part, found near the end of 2021 that Macalou's mood varied from mildly anxious to dysphoric.  (Id. at 1135, 1137, 1139, 1141.)  She also observed, and continued to do so as late as mid-2022, that Macalou's functional status was "[v]ariably impaired."  (Id. at 1135, 1137, 1139, 1141, 1060.)  While not uniformly abnormal, the Court sees additional support for the opinions of Macalou's treating providers in these results.

The opinions of Macalou's treating providers are further backed by her self-reported symptoms.  The Second Circuit "has long recognized that subjective complaints of disabling conditions are not merely evidence of a disability, but are an 'important factor to be considered in determining disability.'"  Miles v. Principal Life Insurance Co., 720 F.3d 472, 486 (2d Cir. 2013) (quoting Connors, 272 F.3d at 136).  Courts have relied on such complaints as supporting evidence for the disability findings of treating physicians.  See Doe, 116 F. Supp. 3d at 229-30 (determining that a treating physician's conclusions were corroborated by plaintiff's subjective reports of his symptoms); Chicco, 2022 WL 621985, at *4 (same).  Macalou's subjective complaints to her providers, as captured in their treatment notes, were consistent with their determinations that she was precluded from working.  For example, Macalou reported struggles with her concentration, time management, and energy to Dr. Rodriguez; enduring panic attacks and feeling "paralyzed" about returning to work to Dr. Cohen; experiencing anxiety, depression, apathy, and feelings of guilt and low self-worth to Dr. McAleer; and difficulties with her memory, communication, and concentration to Dr. Caraballo.  (SAR at 179, 182, 269, 522, 542, 795, 1036, 1337.)

- 38 -

Defendants contend that Macalou's symptoms were due to the "racist and toxic" environment that she perceived at McKinsey specifically, rather than a more general medical condition.  (See, e.g., Def. Br., ECF 81 at 2, 25-26; Def. Reply, ECF 90 at 8.)  The Court agrees with Dr. McAleer's view that Macalou's symptoms "transcend her 'job situation,' and would likely be present in any high pressure work environment."  (SAR at 1039.)  Consistent with Dr. McAleer's opinion, other aspects of Macalou's life, namely her relationships with her son and husband, brought her considerable stress and also triggered her symptoms.  For instance, Macalou reported to Dr. Rodriguez that her relationship with her son caused her to feel shame, guilt, and overwhelmed.  (Id. at 417, 426.)  She also told Dr. Caraballo that she had a panic attack before a planned trip to Mali to see her husband due to her concerns that it would not go well.  (Id. at 782.)  And Macalou similarly stated to Dr. McAleer that her husband's presence had forced her to "take[] all the attention off my needs and caring for myself."  (Id. at 1233.)  Further supporting Dr. McAleer's opinion, there is no indication that Macalou's return to McKinsey in March 2022 proved unsuccessful because of any racist or toxic situations that she encountered at that time.  Macalou reported feeling anxious and overwhelmed, forgetting her words, and losing her hair—symptoms that appear to have been triggered and exacerbated by the general stress and demands of a high-pressure workplace.  (Id. at 1095-1096, 1322.)

Other Considerations

The Policy that First Unum administers defines "disability" and "disabled" to mean in relevant part that "the insured cannot perform each of the material duties of [her] regular occupation."  (Id. at 110.)  The Policy does not, however, define the meaning of the term "regular occupation."  (Id. at 98-124.)  When no definition is provided, the Second Circuit has held that "the applicable definition of regular occupation shall be a position of the same general

character as the insured's previous job, requiring similar skills and training, and involving comparable duties." Kinstler v. First Reliance Standard Life Insurance Co., 181 F.3d 243, 252 (2d Cir. 1999) (quoting Dawes v. First Unum Life Insurance Co., 851 F. Supp. 118, 122 (S.D.N.Y. 1994)) (internal quotation marks omitted). Defining a plaintiff's regular occupation requires "some consideration of the nature of the institution where she was employed," but the term "is not to be defined so narrowly as to include only the characteristics of her [previous job], it must be defined as a position of the 'same general character' as her job." Id. at 253. In Kinstler, for instance, plaintiff was the Director of Nursing Services at a drug rehabilitation center. Id. at 245. Accordingly, the Second Circuit defined her regular occupation as "a director of nursing at a small health care agency, as distinguished from a large general purpose hospital." Id. at 253.

   The Court sees no difference of significance in this case between First Unum's classification of Macalou's regular occupation as Business Consultant and Macalou's classification of her occupation as Project Director and Project Management Specialist. Both sides' vocational consultants took into account the requirements of Macalou's "Expert Associate Partner" role at McKinsey in reaching their determinations. (SAR at 330, 1358-1359, 1475-1476.) In turn, they landed on occupational classifications that generally reflected the highly skilled work that would be expected of Macalou at a global consulting firm comparable to McKinsey. This is evidenced by the largely overlapping material duties that they associated with Macalou's occupation, including identifying and winning new business; communicating and collaborating with clients and colleagues; planning, implementing, and managing projects; deploying specialized expertise; and gathering and leveraging information for business purposes. (Id. at 330-331, 1362-1363.)

Whether Macalou's regular occupation is classified as Business Consultant or as Project Director and Project Management Specialist, Macalou's treating providers credibly concluded that she was unable to work. As noted above, Macalou's treating providers consistently found that her health conditions and symptoms limited her in sustaining concentration and focus, communicating and interacting with others, time management and multi-tasking, analytical thinking, and tolerating stress. (Id. at 78, 87, 278, 282, 1036-1037, 1314-1315.) These limitations are inconsistent with a highly skilled job such as Macalou's and each of the material duties identified by Macalou's and First Unum's vocational consultants.

Having evaluated the opinions of Macalou's treating providers and First Unum's file reviewers, the Court credits and assigns greatest weight to the former. Macalou has demonstrated by a preponderance of the evidence that she is disabled under the terms of the Policy.

CONCLUSION

The Court concludes that Macalou has met her burden to show that she is disabled under the Policy. Macalou is awarded long-term disability benefits to the date of judgment, together with any adjustments and other benefits required by the Policy. As Macalou has prevailed on the merits, she is also entitled to reasonable attorneys' fees and costs. See Donachie v. Liberty Life Assur. Co. of Boston, 745 F.3d 41, 46 (2d Cir. 2014) ("whether a plaintiff has obtained some degree of success on the merits is the sole factor that a court *must* consider in exercising its discretion" to award attorneys' fees under ERISA) (citing Hardt v. Reliance Standard Life Insurance Co., 560 U.S. 242, 255 (2010)). After taking into account "(i) the need to fully compensate the wronged party for actual damages suffered, (ii) considerations of fairness and the relative equities of the award, (iii) the remedial purpose of the statute involved, [and] (iv)

such other general principles as [have been] deemed relevant," the Court further concludes, in its discretion, that Macalou is entitled to receive prejudgment interest. <u>Jones v. UNUM Life Insurance Co. of America</u>, 223 F.3d 130, 139 (2d Cir. 2000) (citation omitted).

The Court's conclusion that Macalou has demonstrated by a preponderance of the evidence that she was disabled from the first day of the elimination period to the date of First Unum's denial of her appeal also means that she is entitled to benefits to the date of judgment. The Policy states that "[d]isability benefits will cease on the earliest of: 1. the date the insured is no longer disabled; 2. the date the insured dies; 3. the end of the maximum benefit period; 4. the date the insured's current earnings exceed 80% of [her] indexed pre-disability earnings." (SAR at 114.) The Policy also states that monthly benefits "will be paid for the period of disability if the insured gives to the Company proof of continued: 1. disability; and 2. regular attendance of a physician." (<u>Id.</u> at 112.) This proof "must be given upon request and at the insured's expense." (<u>Id.</u>) So far as the record shows, First Unum has not made such a request of Macalou following its denial of her appeal, nor has it determined that Macalou is no longer disabled as of the date of judgment. <u>See</u> <u>Locher v. Unum Life Insurance Co. of America</u>, 389 F.3d 288, 297-98 (2d Cir. 2004) (affirming an award of benefits through the date of judgment where the insurance policy placed the burden of requesting evidence of continued disability on the insurer and the insurer had not made any such request).

Counsel for Macalou shall submit a proposed final judgment on notice within 14 days hereof. Final judgment need not await the award of attorneys' fees and costs. Rule 54(d)(2)(B), Fed. R. Civ. P. Plaintiff's motion for attorneys' fees shall be filed within 21 days of entry of judgment, defendants shall respond 14 days after the motion, and plaintiff may reply 7 days after defendants' response.

SO ORDERED.

P. Kevin Castel
United States District Judge

Dated: New York, New York
       November 22, 2024